**Vincent URBANIAK, Plaintiff,**

v.

**ERIE LACKAWANNA RAILWAY COMPANY, Defendant.**

**Civ. No. 73–116.**

United States District Court,
W. D. New York.

Jan. 12, 1977.

---

8. 7 CFR § 272.6, *supra*.

9. 7 U.S.C. § 2017, *supra*.

10. 7 CFR § 262.1, *supra*.

John F. Collins, Collins, Collins & Dinardo, Buffalo, N. Y., for plaintiff.

Richard F. Griffin, Moot, Sprague, Marcy, Landy, Fernbach & Smythe, Buffalo, N. Y., for defendant.

## MEMORANDUM AND ORDER

ELFVIN, District Judge.

This action under the Federal Employers' Liability Act (45 U.S.C. §§ 51 et seq.) was commenced after plaintiff was injured on the job on October 3, 1972. On September 15, 1975 a jury's verdict of $34,000 was returned in plaintiff's favor. The entire amount of the verdict was paid with the exception of $3,854.72 which defendant contends it paid to Buffalo Emergency Hospital and plaintiff's orthopedic group, Dr. Haley, Dr. Ring and Dr. Bertola. Plaintiff contends that he is entitled to receive this amount under the application of the collateral source rule. Plaintiff maintains that, while he did not pay the hospital and doctor bills in dispute, defendant was reimbursed under a policy of insurance known as Travelers Group Policy Contract No. GA–23000 which was required under a collective bargaining agreement between plaintiff's union and defendant Railroad.

Recently the Second Circuit Court of Appeals considered a mirror image of this factual situation in *Blake v. Delaware and Hudson Railway Company*, 484 F.2d 204 (1973). It was the decision of the Court that under 45 U.S.C. § 55 [1] the railroad is entitled to set off only the premiums, not what the premiums bought. Circuit Judge Lumbard, dissenting, argued that 45 U.S.C. § 55 was never intended to apply to situations as presented.

While in most instances the decision in *Blake, supra*, would have settled the question, defendant in the case before this Court contends that the record in *Blake, supra*, was inadequate and that the question before me was not presented to the appellate court for decision. To support this contention, defendant refers to the analysis of *Blake, supra*, of the United States District Court for the Western District of Pennsylvania in *Thomas v. Penn Central Company*, 379 F.Supp. 24 (1974):

> " * * * In *Blake*, the plaintiff argued that the insurance coverage for medical payments arose from a collective

---

1. "Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter [45 U.S.C. §§ 51–60], shall to that extent be void: *Provided*, That in any action brought against any such common carrier under or by virtue of any of the provisions of this chapter, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought."

bargaining agreement while the defendant resisted that argument on the basis that the court should not look behind the simple fact that the contract was a policy of insurance. Thus, the case was before the court on a very similar posture as that in *Hall* [*Hall v. Minnesota Transfer Railway Company*, 322 F.Supp. 92 (D.Minn., 1971)], without evidence as to the critical issue of the underlying purpose and separate funding of the on-duty medical benefits clause. * * * This Court is of the opinion that had the Second Circuit had before it all of the facts and circumstances as we have in this case, the Collateral Source Rule would not have been applied." *Thomas v. Penn Central Company, supra,* at 28.

In order to supplement the record in this case with evidence as to the critical issue of the underlying purpose and separate funding of the on-duty medical benefits clause, a hearing was held after the verdict herein at which there was adduced the testimony of William L. Burner Jr. who is a member of the National Railway Labor Conference and was a participant in the collective bargaining which resulted in GA–23000.

Such testimony indicates that prior to 1955 it was the widespread industry practice to pay medical expenses incurred as the result of on-duty injuries without such being required under union contract. In 1955, agreement was reached between a number of railroads (including defendant) and the union representing the non-operating employees in which the union elected to receive somewhat lower wages than those provided for operating employees and, in lieu thereof, a health and welfare plan represented by GA–23000. The operating employees, which category includes engineers, conductors, brakemen and other persons engaged in the actual operation of the trains, elected to receive such coverage's cost equivalent in money wages.

Subsequently, an agreement was reached with the non-operating employees in which the premium for the medical reimbursement for on-duty injuries was to be borne solely by the railroad and not to be considered a wage equivalent. The Collective Bargaining Agreement of August 19, 1960 expressly provided in Article V, Section 1(d)(1):

"In addition to the payments hereinafter provided for, carriers whose employees are insured under The Travelers Insurance Company Group Policy Contract No. GA–23000 with respect to both employee benefits and dependent benefits will transmit to The Travelers Insurance Company 81 cents per 'Qualifying Employee' per month as premium for the insurance benefit payments resulting from on-duty injuries. The amounts so transmitted are not considered as wage equivalents; separate experience rating of benefits payable by reason of on-duty injuries will be maintained; any retroactive premium credit based on such separate experience rating will be separately determined and will be held in the Special Account as a separate fund to be applied to the cost of insurance benefits payable as a result of on-duty injuries." (Underscoring added.)

The operating employees, of which plaintiff is one, were not covered by a similar health and welfare plan or by GA–23000 until 1964. By agreement dated March 26, 1964 between a number of railroads (including the defendant) and operating unions (including the Brotherhood of Railroad Trainmen), a health and welfare plan was established for operating employees. The agreement also established the procedure by which the premiums for such insurance would be paid. The railroads would contribute $23.00 a month per qualified employee for the health and welfare plan except for on-duty injuries. As to on-duty injuries, the railroads' contribution of $23.00 per employee for January and February of 1964, which had accumulated during the negotiations, were to be used to fund on-duty benefits for the first two years, and thereafter the railroads would assume the entire cost of the on-duty injuries.

The agreement, however, does not discuss whether the premiums for the general

health and medical plan or the on-duty injuries plan were or were not wage equivalents. This is in comparison with the August 19, 1960 agreement with the non-operating unions which specifically and unambiguously deals with such question. Nevertheless, Mr. Burner testified that only the $23.00 for the general health and welfare plan was a wage equivalent. This conclusion is not without support. One of the key elements in railroad labor relations has been the maintenance of parity of wage treatment between the operating and non-operating railroad employees. In addition, there is the history of the operating employees' plan after the initial agreement.

In the third year, the railroads provided the entire premium for on-duty injury benefits in addition to the general plan. In the fourth year, on-duty injuries were taken out of the insured plan entirely and the railroads resumed providing on-duty injury benefits directly. Finally on February 29, 1968, the operating and non-operating employees were insured through the same Travelers Group Policy, Contract No. GA–23000. This policy provided for separate premium rates based upon separate experience factors to finance the on-duty injury benefits. This policy GA–23000 was substantially rewritten by amendment on March 1, 1972 but none of the changes affected the premium structure. This amended Policy GA–23000 was in effect when plaintiff was injured.

Based upon the above history of the on-duty injury benefits plan, defendant urges this Court to deny plaintiff judgment for the disputed hospital and medical bills. However, this Court must disagree. The decision in *Blake, supra,* constrains me to hold against defendant.

I am not at liberty to hold that 45 U.S.C. § 55 does not apply as was held in *Thomas, supra. Blake* held that § 55 governs. As part of his concurring opinion, Judge Friendly added: "If the railroads wish to avoid the harsh result reached by the district court, they can accomplish this by specific provision in the collective bargaining agreement." *Blake, supra,* at 207 (Friendly, J., concurring). Because I must consider § 55 applicable, this case is limited to the determination of whether such specificity has been shown. A review of the evidence and testimony at the post-trial hearing indicates that it is not found in the controlling collective bargaining agreement. Therefore there has been an insufficient showing that the railroad is entitled to a credit for payments received by plaintiff under GA–23000.

Defendant hereby is ordered to pay with interest the amount of the verdict withheld pending the outcome of this motion.